**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| UNITED STATES OF AMERICA, | Case: 2:15-cr-622-SDW |
|---|---|
| v. | **OPINION** |
| JUDY TULL and KAY ELLISON, | |
| Defendants. | June 18, 2018 |

**WIGENTON**, District Judge.

Before this Court are Defendants Kay Ellison ("Ellison") and Judy Tull's ("Tull") (collectively, "Defendants") Motions for Judgments of Acquittal pursuant to Federal Rule of Criminal Procedure 29 and Motions for a New Trial pursuant to Federal Rule of Criminal Procedure 33.[1] For the reasons stated below, the Motions are **DENIED**.

### I.    BACKGROUND AND PROCEDURAL HISTORY

This Court assumes familiarity with the allegations and procedural history of this case and reviews only the facts relevant to the present motions. On December 10, 2015, Tull, co-founder and Chief Executive Officer of Southern Sky Air & Tours d/b/a "Myrtle Beach Direct Air & Tours" ("Direct Air"), a privately-held public charter company, and Ellison, co-founder and

---

[1] Defendant Tull joins in Ellison's motions, so all arguments made by Ellison are applied to Tull unless otherwise noted. (*See* Dkt. No. 115, 118.)

1

Managing Partner of Direct Air, were indicted by the United States Attorney's Office for the District of New Jersey for their alleged roles in conspiring to commit bank and wire fraud while serving as Direct Air executives. (Dkt. No. 1, Indict. at 4.) A Superseding Indictment, filed on December 8, 2016, specifically alleged that Defendants improperly withdrew passenger funds for future flights held in a "designated depository or escrow account" maintained at Valley National Bank ("Valley")[2] in violation of Department of Transportation ("DOT") regulations[3] requiring that those funds be held in escrow until the completion of corresponding flights. (Dkt. No. 44.) The Superseding Indictment charged Defendants as follows:

Count 1: Conspiracy to Commit Wire Fraud and Bank Fraud in violation of 18 U.S.C. § 1349.

Counts 2-5: Wire Fraud in violation of 18 U.S.C. § 1343 and § 2.

Count 6-8: Bank Fraud in violation of 18 U.S.C. § 1344 and § 2.

(*Id*.) Defendants moved to dismiss the Superseding Indictment on January 26, 2018. (Dkt. No. 70-74.) This Court denied Defendants' motions. (Dkt. No. 81, 83.)[4] Trial began on March 22, 2018 and the jury began deliberating on March 28, 2018. That same day, the jury found Defendants guilty on all counts. (Dkt. No. 109.) On April 11, 2018, Defendants moved for Judgments of Acquittal/New Trial.[5] The Government filed its opposition on April 25, 2018, and Defendants filed their replies on May 7, 2018. (Dkt. No. 116, 117.)

---

[2] Valley is referred to as "Bank #1" in the Superseding Indictment.

[3] *See* 14 C.F.R. § 380.

[4] Defendants filed two separate motions to dismiss on January 26th. (Dkt. No. 71, 72.) This Court dismissed the first motion on February 23, 2018 for the reasons set forth on the record on that date. (Dkt. No. 81 at 1.) This Court dismissed the second motion in its written Opinion and Order entered on March 1, 2018. (Dkt. No. 81, 83.)

[5] Defendants moved for judgments of acquittal pursuant to Rule 29 at the close of the Government's case. (*See,* Tr. Trans. vol. 6, 1123.) This Court reserved decision and addresses all issues raised by those motions in this Opinion.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29 ("Rule 29") requires the district court to enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). However, the court must "sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 169-70 (3d Cir. 2003); *see also United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006). In reviewing a motion for acquittal, the court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Flores*, 454 F.3d at 154 (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). The court must view "the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (internal citations omitted); *see also United States v. Styles*, 659 Fed. App'x 79, 83 (3d Cir. 2016). The government also receives "the benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 738 F.3d 614, 618 (3d Cir. 1986). All credibility challenges are resolved in the government's favor. *United States v. Scanzello*, 822 F.2d 18, 21 (3d Cir. 1987). As such, a defendant bears "a heavy burden" to establish that the trial evidence was insufficient to support a conviction. *United States v. Young*, 334 Fed. App'x 477, 480 (3d Cir. 2009); *see also United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990); *United States v. Baroni*, Crim. No. 15-193, 2017 WL 787122, at *2 (D.N.J. Mar. 1, 2017).

---

Pursuant to the requirements of Rule 29, the motion will be decided "on the basis of the evidence at the time the ruling was reserved." FED. R. CRIM. P. 29.

The standard under Federal Rule of Criminal Procedure 33 is "more general" and provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Tiangco*, Crim. No. 15-567, 2016 WL 7104841, at *2 (D.N.J. Dec. 5, 2016) (citing FED. R. CRIM. P. 33(a)). However, "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *Silveus*, 542 F.3d at 1004-05 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). The court is not required to "view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150. "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Silveus*, 542 F.3d at 1005 (internal citations omitted).

### III. DISCUSSION

#### A.

Turning first to Defendants' Rule 29 motions for judgments of acquittal, Defendants challenge their convictions on all counts, generally arguing that the Government failed to prove essential elements of each crime. (Dkt. No. 114, 114-1.)

**Count One**

Count One of the Superseding Indictment alleges that Defendants conspired to commit bank and wire fraud in violation of 18 U.S.C. § 1349. Defendants argue that the Government failed to prove that they "conspired to and or acted in such a way as to knowingly create or submit false or fraudulent Direct Air financial statements to any financial institution." (Dkt. No. 114 at 2; 114-1 at 22.) In proving such a charge, co-conspirator testimony is "highly pertinent to the question of the defendant's knowing complicity in the crime." *United States v. Claxton*, 685 F.3d

4

300, 309 (3d Cir. 2012) (noting that an "admitted-conspirator's trial testimony regarding who was or was not his co-conspirator" was strong evidence that defendant was involved in the conspiracy).

Here, Robert Keilman ("Keilman"), Direct Air's former Chief Financial Officer, pled guilty to conspiring with Defendants to commit wire fraud and then testified at Defendants' trial regarding that conspiracy. (Tr. Trans. vol. 4, 775-849.) Keilman testified that he, Tull and Ellison "stole money from the escrow account" to pay bills and salaries and to "pay back a bank loan," and that the three acted in concert to cover up the fraud. (Tr. Trans. vol. 3, 780-81, 790-91, 795-96.) Keilman detailed how he and Defendants took money out of the escrow account and prepared and submitted false financial statements to Direct Air's banks and credit card companies, including Valley, Merrick Bank, and American Express,[6] in order to hide Direct Air's unstable finances from those financial institutions. (*See* Tr. Trans. Vol 4, 780-804, 808-10, 816-23.) Keilman's testimony, taken as true, provides a sufficient basis upon which a rational juror could find beyond a reasonable doubt that Defendants conspired to commit bank and wire fraud.[7] Therefore, Defendants' motions for judgments of acquittal as to Count One are denied.

**<u>Counts Two-Five</u>**

Counts Two through Five of the Superseding Indictment allege that Defendants committed wire fraud in violation of 18 U.S.C. §§ 1343 and 2.[8] The elements of wire fraud are "(1) a scheme

---

[6] Merrick Bank is referred to as "Bank #2" in the Superseding Indictment and "acquired, cleared, and settled credit and debit card payments made by certain customers booking flights through Direct Air." (Dkt. No. 44 at 3.) American Express, referred to as the "Credit Card Company" in the Superseding Indictment, issued credit cards which some passengers used to pay for Direct Air flights. (*Id.* at 4.)

[7] Testimony by other witnesses including Edward Warneck, a former Direct Air partner and co-founder, and Mary Ann Jarrell, a former employee, also indicated that Tull and Ellison were engaged in activities designed to hide Direct Air's financial condition and improperly move money out of the escrow account in order to pay debts. (*See* Tr. Trans. vol. 2, 384-86, 375-80; Tr. Trans. vol. 3, 630-36.)

[8] The substantive crime of wire fraud itself is defined in relevant part as:

or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012); *see also United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010); *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004); 3D CIR. MODEL CRIM. JURY INSTR. § 6.18.1343. Here, the Government was also required to prove that the wire fraud affected a financial institution.[9] (Dkt. No. 116 at 11.)

The Government presented evidence at trial from which a rational jury could have found that Defendants committed wire fraud that affected a financial institution. First, multiple witnesses testified that Defendants engaged in a scheme to defraud. As discussed above, Keilman testified that he and Defendants submitted falsified financial statements in order to steal "money from the escrow account" held at Valley. (Tr. Trans. vol. 4, 780-81, 790-91, 795-96.) In addition, Edward Warneck, a former Direct Air executive, testified that Defendants were aware of the DOT escrow rules and acted to remove money from the account in violation of those rules. (Tr. Trans. vol. 2, 364-65, 384-88.) Mary Ann Jarrell, a former Direct Air employee, testified that Ellison asked her to falsify passenger reservations in order to reach certain sale amounts, which were then submitted to Valley to request the release of funds from escrow. (Tr. Trans. vol. 2, 630-36.) This testimony

---

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

[9] There is no dispute that Valley, American Express, and Merrick Bank are financial institutions under the statute. *See* 18 U.S.C. § 1343, 18 U.S.C. § 20(1), 12 U.S.C. § 1813(c)(2), 18 U.S.C. § 20(6) & 12 U.S.C. § 1813(w).

is sufficient grounds for a reasonable jury to determine that Defendants engaged in a scheme or artifice to defraud to obtain money. This Court finds no merit in Defendants' arguments that the Government failed to prove 1) that Defendants wrongfully appropriated monies held in Valley's escrow account, or 2) that Defendants "while in any position to control the actions of" Direct Air "caused any losses or shortfalls to" the Valley account. (Dkt. No. 114.) Those two issues are questions of fact that the jury resolved in favor of the prosecution.

As to the issue of specific intent, the Government need only prove "that a defendant had general knowledge of the law which forbade his actions and acted with the specific intent to circumvent the law." *United States v. Brodie*, 403 F.3d 123, 147 (3d Cir. 2005) (noting further that the prosecution is not required to prove that "the defendant had knowledge of the specific regulation governing the conduct engaged in . . .") (internal citations omitted). Witnesses testified that Defendants were aware of DOT rules regarding escrow accounts and had been advised by counsel that passenger money was to remain in the escrow account until flights had been completed. (*See* Tr. Trans. vol. 3, 509-13 (testimony of attorney Aaron Goerlich discussing regulations regarding escrow accounts and noting that Defendants "appeared to understand" the escrow rules); Tr. Trans. vol. 2, 364-65 (testimony of Edward Warneck describing Defendants' knowledge of the regulations governing the escrow account).) Witnesses, including Keilman, also testified that Defendants acted to hide their activities from Direct Air Employees and the company's banks and credit card companies. (*See* Tr. Trans. vol. 3, 630-35 (testimony of Mary Ann Jarrell regarding Ellison's requests to falsify reservations); Tr. Trans. vol. 4, 734-37 (testimony of Diane Drummond regarding Defendants' control over Direct Air finances).)

Third, the evidence is sufficient to show that Defendants used the mails and/or wires to further their scheme. The Government entered into evidence facsimile and email transmissions of

falsified financial documents that were sent to Valley (in the form of fund release requests) and to American Express and Merrick Bank (in the form of profit and loss statements). (*See e.g.*, GX 2-8, 109, 119, 231.)[10] Defendants also stipulated that the release requests were sent by interstate facsimile. (Tr. Trans. vol. 6, 1121-22.)

Finally, based on the evidence presented, a rational jury could have found that Defendants' scheme negatively affected financial institutions. Representatives from Valley, American Express, and Merrick Bank testified as to the financial losses their companies suffered from the fraudulent scheme and the litigation which arose from Defendants' actions. (Tr. Trans. vol. 3, 580-81 (testimony of Lori Rooney discussing Valley's litigation expenses); Tr. Trans. vol. 5, 1035-37 (testimony of Joseph Pabst of American Express stating that "losses" from the escrow account "were paid for by American Express"); Tr. Trans. vol. 5, 1096-98 (testimony of Richard Fox of Merrick Bank noting that the bank was forced to cover passengers' losses when the shortfall in the escrow account was discovered and ongoing costs of the six-year litigation arising from the fraud).)

Resolving all credibility questions and inferences in favor of the prosecution, the evidence in question is sufficient for a rational juror to find beyond a reasonable doubt that Defendants were guilty of committing wire fraud affecting a financial institution. Therefore, Defendants' Motions for Judgments of Acquittal on Counts Two, Three, Four, and Five are denied.[11]

**Counts Six-Eight**

Defendants were also convicted of committing bank fraud in violation of 18 U.S.C. §§ 1349, 1344 and 2. A person commits bank fraud when she "knowingly executes, or attempts

---

[10] All citations to "GX" refer to Government trial exhibits.

[11] The Defendants also attempt to characterize the DOT regulations as an unconstitutional taking, which impermissibly changed money earned by Direct Air into "something else." (Dkt. No. 114-1 at 8, 1-8.) Defendants provide no case law support for such a claim, nor was the jury persuaded by those arguments at trial.

8

to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

Once again, the Government presented evidence at trial from which a rational jury could have found that Defendants committed bank fraud. Multiple witnesses testified that Defendants were aware of DOT regulations requiring that passenger funds be kept in escrow accounts until a flight was completed, yet removed those funds in contravention of those regulations. (*See, supra* 6-7; Tr. Trans. vol. 2, 305-13 (testimony of Lisa Swafford-Brooks of the DOT noting that DOT regulations require funds to be maintained in escrow "to protect passenger funds before their flight").) As to the question of whether the funds at issue were in Valley's custody or control, "[i]t is a fundamental principle of banking law that money deposited with a bank becomes the bank's property." *United States v. Monostra*, 125 F.3d 183, 187 (3d Cir. 1997). (*See also* Tr. Trans. vol. 3, 557-58 (testimony of Lori Rooney of Valley explaining that Valley maintained the escrow account and that Tull understood that there was a "shortfall" in the account).)[12] Resolving all credibility questions and inferences in favor of the prosecution, the evidence in question is sufficient for a rational juror to find beyond a reasonable doubt that Defendants were guilty of committing bank fraud, therefore, Defendants' Motions for Judgments of Acquittal on Counts Six, Seven, and Eight are denied.

**B.**

---

[12] This Court finds no merit in Defendants' argument that they could not have committed bank fraud because neither American Express nor Merrick Bank had ownership or custody of the funds at issue. The Government was only obligated to prove that a financial institution had custody or control of the funds, which Valley did. 18 U.S.C. § 1342.

Federal Rule of Criminal Procedure 33 requires a court to grant a new trial only sparingly and in exceptional circumstances where the interests of justice so require. *Silveus*, 542 F.3d at 1005.[13] Here, Defendants argue that a new trial is warranted because: 1) this Court erred by ruling that the Government could use "evidence relating to a bankruptcy filing of the Defendant some twenty or more years ago in West Virginia as 404(b) evidence to prove a common plan or scheme"; and 2) "the Government repeatedly referred to statements allegedly made by the Defendant[s] as lies." (Dkt. No. 114 at 33; 114-1 at 34).[14]

**404(b) Evidence**

Evidence of past wrongful acts is permissible in a criminal trial under the Federal Rules of Evidence only to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). Such evidence is not permissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). Defendants argue that this Court improperly ruled that the Government could use evidence of twenty-year-old bankruptcy filing by Defendant Ellison as "404(b) evidence to prove a common plan or scheme," in the Government's case in chief. (Dkt. No. 114-1 at 33.) This Court made no such ruling. Rather, the court reserved

---

[13] Rule 33 is not to be used to re-litigate pretrial motions or discovery disputes. Therefore, this Court will not address Defendants' arguments involving this Court's pretrial orders 1) requiring Defendants to produce discovery (Dkt. No. 114-1 at 24-29; 117 at 1-11), 2) delaying the start of trial to permit the Government to produce additional discovery (Dkt. No. 114-1 at 30-33), or 3) denying Defendants' motion to dismiss the Superseding Indictment (Dkt. No. 114-1 at 36-37.) Defendants may challenge those rulings on appeal.

[14] Defendants also alleged that a new trial is warranted because this Court refused "to give Defendants' Joint Proposed Jury Instructions numbered 4, 5, 13, 14, and 15 and [gave] Government's Requests 22, 23, 28, 35, 46, and 48 and Government's Proposed Requests 1, 4, and 5." (Dkt. No. 114.) Aside from this one sentence, however, Defendants provide neither an argument as to why this Court's decisions were incorrect nor legal support for their position. Having addressed the parties' positions regarding jury instructions at a charge conference on the record on March 27, 2018, (Tr. Trans. vol. 6, 1132-65), and in the absence of any substantive legal arguments from Defendants challenging the instructions, this Court declines to revisit its rulings on the jury instructions.

its decision until the issue came up at trial. (Dkt. No. 80 at 77.) Because no 404(b) evidence was presented at trial, this issue does not provide a basis upon which to grant a new trial.[15]

**<u>Alleged Inappropriate Statements</u>**

Next, Defendants argue that the Government engaged in "repeated name-calling," and referred to "statements allegedly made by the Defendant[s] as lies."[16] (Dkt. No. 114-1 at 34.) Defendants' position is that those references "so infected the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding." (*Id.* at 34 (citing *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008)).) It is well-established that "the adversary system permits the prosecutor to prosecute with earnestness and vigor" but bars "overzealous conduct." *United States v. Young*, 470 U.S. 1, 7 (1985); *see also United States v. Vaghari*, 500 Fed. App'x 139, 144 (3d Cir. 2012). This Court is satisfied that the Government acted properly.

First, the record does not show that the Government ever called the Defendants liars or engaged in any "name-calling."[17] Rather, in making its case that Defendants committed multiple acts of fraud, charges which by their very nature involve some level of deception and untruth, the

---

[15] Defendants' position that the specter of that evidence being introduced prevented Ellison from testifying on her own behalf is contradicted by the record, which reflects a strategic decision by defense counsel not to put on a defense because it believed the Government had failed to prove its case. (*See* Tr. Trans. vol. 6, 1123-24 (stating for the record that upon the Government's decision to rest "and after consultation with my client, we are not going to present a defense, and Ms. Ellison is prepared to go to the jury); 1192-93 (stating in closing argument that "given what [the Government has] presented in this courtroom, we have chosen to end this and not go forward with the evidence . . . under the law, there is no case").)

[16] Although Defendants claim that the Government "repeatedly" referred to the Defendants as "liar[s]," (Dkt. No. 114, Dkt. No. 114-1 at 8 (stating that the Government called "the Defendants liars over and over and over again" and "used the word 'liar' or some variation thereof . . . literally hundreds of times"), nothing in the transcript supports that allegation.

[17] In fact, the only people who referred to the Defendants as liars were defense counsel in closing arguments. (Tr. Trans. vol. 6, 92 (claiming that the Government had called Defendants "liars and cheats and thieves"), 117 (accusing the Government of calling Tull "a liar, calling her a cheat and all of that sort of thing").)

Government pointed the jury to false statements the Defendants and their co-conspirator Keilman made and described them as lies. (*See, e.g.*, Tr. Trans. vol. 2, 258-66, vol. 4, 824-25, 828-30, 835-41, 843-50; vol. 6, 1168-82, 1184-90.) This is within the bounds of appropriate advocacy and was justified by the evidence which indicated that Defendants had falsified financial documents in order to improperly remove funds from the Valley escrow account. *See Vaghari*, 500 Fed. App'x at 144 (noting that "references to 'lies' or 'lying' standing alone [is not] proof of prosecutorial misconduct").

There being nothing in the record to indicate that the jury verdict is contrary to the weight of the evidence and nothing to suggest that the proceedings interfered with the interests of justice, Defendants' motions for a new trial are denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions for Judgments of Acquittal and for a New Trial are **DENIED**. An appropriate order follows.

                                    s/ *Susan D. Wigenton*  
                                    **SUSAN D. WIGENTON**  
                                    **UNITED STATES DISTRICT JUDGE**

Orig:        Clerk  
cc:          Parties